```
                   UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF OHIO
                        WESTERN DIVISION
```

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | NO. 1:07-CR-00019 |
|  | : |  |
| v. | : |  |
|  | : | **OPINION AND ORDER** |
| CHARLES KIMBER. | : |  |
|  | : |  |

This matter is before the Court on Defendant's Motion to Suppress (doc. 13) and the United States' Response (doc. 15). The Court held a hearing on Defendant's Motion on April 26, 2007, and continued such hearing until May 1, 2007. For the reasons indicated herein, the Court DENIES the instant motion.

**I.  Background**

This matter pertains to the warrantless stop of Defendant by Cincinnati Police Officers on November 11, 2006, which Defendant contends was unsupported by either reasonable suspicion or probable cause and therefore violated his Fourth Amendment right to be free of unreasonable search and seizure. Defendant seeks to suppress the firearm, a loaded Cobra .380 caliber pistol, and other contraband, seized incident to his stop and seizure because he argues the police had no justification to stop him.

At the April 26, 2007 hearing in this matter, Cincinnati Officers Kenneth J. Grubbs and Brian Stewart testified as to their encounter with Defendant at the Alms Hill Apartments, 2525 Victory

Parkway, in Cincinnati, shortly after 11:00 P.M. on November 11, 2006. The Officers are partners and members of the District 4 Violent Crime Squad, ("Squad"), which is comprised of a half-dozen officers. The Squad investigates drug complaints, drug activity, shootings, and robberies that take place in their District.

On the evening of November 11, Officer Stewart testified that as the weather was not good, the decision was made that the Squad would work in their "hot spots," and the Alms Hill Apartments was the first building they decided to visit. Both Officers testified that they had been to Alms Hill Apartments on numerous occasions as the location is known for its criminal activity. Stewart testified he had been on the premises some fifty times, and had made arrests for drugs, prostitution, warrants for robberies, and for possession of firearms. During the week preceding November 11, 2006, Stewart testified the Squad made four to five weapons arrests at the Alms Hill location. Both Officers further testified that the owner of the building had signed a letter granting the Officers authority to come onto the premises to investigate incidents of criminal trespass. Officer Stewart indicated that the onsite private security company told him on previous occasions that police presence was needed, and they had provided the police with information about problems with specific apartments in the building.

At the hearing, the government proffered its Exhibit 1,

2

a diagram of the floorplan of the Alms Hill Apartments doorways and lobbies.  Both officers testified that the diagram accurately represented the layout of the building on the night they apprehended Defendant.

According to the testimony of Grubbs and Stewart, the Squad officers arrived on the scene on November 11, wearing plain clothes but with "tactical vests" clearly marked with the words "POLICE."  The Squad entered the building by the rear, western, entry door, passed through the rear lobby, and entered through the windowed rear lobby door into the front lobby of the building. While other officers encountered two to three individuals in the front of the front lobby, and proceeded to stop them for trespassing, Officer Grubbs stood at the back of the front lobby, next to the windowed rear lobby door, with his back against the wall.  Officer Stewart stood several paces back from the door, covering for his fellow officers as they conducted their stop of the individuals in the front lobby.  During this investigation, Officer Grubbs heard someone coming through the rear entry door. Grubbs testified he alerted Stewart to this, and Stewart immediately approached the windowed rear lobby door so as to observe who was coming.  Grubbs remained next to the door with his back to the wall, and could not observe who was coming.  Stewart, however, faced the door, and from his perspective could see Defendant and two other individuals entering the building.

3

As Defendant approached the windowed rear lobby door, Officer Grubbs testified that he, Grubbs, reached over to fling the door open, such that Officer Stewart and Defendant were facing one another.  Officer Stewart testified that after Grubbs opened the door, Stewart and Defendant were about eight feet apart.  Stewart testified that as soon as Defendant recognized him as a police officer, Defendant's face showed surprise, "almost like a state of shock."  Officer Stewart testified that next, Defendant turned immediately to walk away, and while doing so

(Stewart) He exposed the left side of his body towards me. . .he shoved his left hand into his left jacket pocket, at which point I could see the magazine and the grip of the gun.

(Counsel) And what did you do at that point in time?

(Stewart) I advised Officer Grubbs that we had a gun.

(Counsel) And next?

(Stewart) We quickly stopped Mr. Kimber.

Stewart further testified,

(Stewart) When I saw the weapon, I saw the black portion. . .it was protruding from the jacket of Mr. Kimber.

(Court) And you said that you also saw the magazine?  Where was the magazine?

(Stewart) This is the magazine port and the magazine goes inside and I can see that.

(Court) But the magazine was inserted?

(Stewart) The magazine was inserted.  When we recovered it, one round was in the chamber and there were four rounds in the magazine.

4

On cross examination, Officer Stewart further testified that when he first saw Defendant,

(Stewart) He was coming through the door, and his hand was down towards the side as he turned to walk away from me he shoved his hand into his jacket. At that point I could see the magazine and the grip of the pistol.

(Counsel) So all you basically [could] see was the bottom of it? The bottom of the magazine?

(Stewart) The bottom of the magazine, the magazine port, and the grip.

Officer Grubbs similarly testified that shortly after Stewart had visual contact with Defendant, "I heard him [Stewart] announce 'gun.'" Defendant immediately cooperated and placed his hands up against the wall in the rear lobby. Officers Stewart and Grubbs took up position on both sides of Defendant. Stewart testified he removed and secured the firearm, and orally advised Defendant of his *Miranda* rights, as Officer Grubbs handcuffed Defendant. Officer Stewart testified that he next asked Defendant if Defendant had anything else on him that the officers might have missed, and Defendant told him he had crack in his hat. Next, Stewart testified Defendant told him he was a convicted felon.

Stewart further testified that he gave Defendant *Miranda* warnings a second time after Defendant was transported to the district headquarters. The government indicates that at this time, Defendant signed a form acknowledging notification of his rights. (Defendant's Exhibit 6). After signing the form, Stewart testified Defendant told Stewart Defendant did not reside at the Alms Hill

5

Apartments, Defendant gave an estimate of the quantity of crack he had on his person, and Defendant indicated he purchased the gun two months earlier from a drug abuser in the Bond Hill area.

**II.    The Fourth Amendment**

Governmental detentions of persons, including arrests, constitute seizures, and as such must be reasonable under the Fourth Amendment. Similarly, evidentiary searches and seizures must be reasonable to be valid under the Fourth Amendment.

    **A.   Detentions of Persons**

There are essentially three types of encounters that can occur between a citizen and a police officer: a consensual encounter, an investigative <u>Terry</u>-type stop, and an arrest. <u>See</u> <u>United States v. Hastamorir</u>, 881 F.2d 1551, 1556 (11th Cir. 1989). A consensual encounter can occur without any suspicion or justification, while an arrest can take place only if the police have probable cause to believe the individual has committed or is committing a crime. <u>Beck v. Ohio</u>, 379 U.S. 89 (1964). The investigative stop falls on the continuum between these two, and allows for police to briefly detain a person for investigative purposes even if they lack probable cause to make an arrest. <u>Terry v. Ohio</u>, 392 U.S. 1 (1968).

    **B.   Searches and Seizures of Evidence**

To be reasonable under the Fourth Amendment, most searches must be pursuant to a warrant. However, there are a

6

number of exceptions, including those under the "plain view" doctrine. The plain view doctrine allows for the seizure of evidence whose incriminating character is immediately apparent when the officers have a lawful right of access to the object. Horton v. California, 469 U.S. 128, 136-37 (1990). Police may also conduct a warrantless search incident to a lawful arrest. Chimel v. California, 395 U.S. 752, 763 (1969), United States v. Robinson, 414 U.S. 218 (1973).

### III. Discussion

As a preliminary matter, the Court notes that the testimony of Officer Grubbs was completely consistent with that of Officer Stewart, down to the details of where they were both standing and what they were doing when Officer Stewart first saw Defendant. The Court found such testimony highly credible and corroborated. The Court did not find persuasive Defense counsel's attempts to impeach the officers' testimony with apparent discrepancies in a subsequent report by Police Specialist Mike Drexelius. Nor did the Court find plausible Defendant's claim that Officer Stewart could not have seen the firearm in his pocket. Indeed, the government demonstrated in open court that the firearm could protrude from Defendant's jacket in such a way that it would have been visible to Officer Stewart.

Moreover, the Court finds credible Officer Stewart's declaration that he quickly advised his partner about the gun as

soon as he saw it. The fact that Stewart made an excited utterance, which Grubbs heard, lends credibility to the fact that Stewart did indeed see the gun. The Court finds it difficult to believe that Stewart would announce to his partner about a gun that he had not seen as a pretext to search Defendant's person.

Defense Counsel also suggested that the Officers had no idea whether Defendant was a resident of the building, and therefore questioned their right to investigate him for trespassing. Defense Counsel showed how that police reports reflected Defendant's address to be at the Alms Hills location, and requested more time from the Court so as to proffer utility bills and other evidence showing that Defendant lived at the address. The Court therefore continued this matter until a second hearing, on May 1, 2007, so as to permit Defendant to produce such evidence and enter it into the record.

At the May 1, 2007 hearing, Defendant proffered a state identity card, issued on June 12, 2006, which the Court admitted as Defendant's Exhibit 10. The identity card indicated that Defendant's address was at 2525 Victory Parkway, the address for the Alms Hill Apartments.

The Court concludes, however, that even if Defendant was a resident at the apartment building, this would make no difference in the reasonableness of his arrest by Officers Grubbs and Stewart. The Officers were present in a common area at the premises in the

8

context of a valid trespassing investigation. The Court accepts the testimony that the location is a crime "hot spot," and that the Officers' presence was justified, and indeed welcomed by the owner of the building.[1] Defendant merely stumbled upon a police investigation in process, and inadvertently exposed his weapon.

Defendant's shocked demeanor upon seeing police, his quick evasive move, and the fact he was in a high crime area would have given the officers reasonable suspicion to justify a Terry stop. Such nervous and evasive behaviors are hallmarks justifying a reasonable suspicion. Illinois v. Wardlow, 528 U.S. 119, (2000), United States v. Brigoni-Ponce, 422 U.S. 873, 885 (1975), United States v. Sokolow, 490 U.S. 1, 8-9 (1989), Michigan v. Chesternut, 486 U.S. 567(1988)(Kennedy and Scalia, JJ., concurring)("respondent's unprovoked flight gave the police ample cause to stop him."), but see California v. Hodari D., 499 U.S. 621, 624, n.1 (1991)(reserving the question whether the police may question those who do nothing more than "scatter in panic upon the mere sighting of the police,"), United States v. Brown, 334 F.3d 1161, 1165 (D.C. Cir. 2003).

---

[1] At the May 1, 2007 hearing the government proffered a letter from Alms Hill building management, dated April 15, 2004, which shows the property owner authorized Cincinnati Police to enforce trespassing laws on the property. Government's Exhibit 8. This letter, taken together with the more recent letter from the current property owner, dated January 31, 2007, Government's Exhibit 2, and the Officers' testimony, leaves no doubt that the Squad was authorized to enter the building on November 11, 2006.

9

The question before the Court, however, is even simpler. The fact of the matter is that Officer Stewart did not need reasonable suspicion to justify a stop of Defendant. In the context of this criminal hot spot, as soon as Stewart saw the gun in plain view, Stewart was reasonably prudent to believe Defendant was committing a crime. Accordingly, Officer Stewart immediately had probable cause to make a weapons arrest. After such arrest, the Court further finds credible Stewart's testimony that he read Defendant his <u>Miranda</u> warnings. As such, Defendant's subsequent statements about possessing crack in his hat, about the quantity of crack he possessed, and where he had obtained the weapon, are all properly admissible as evidence against him. The crack found in Defendant's hat is admissible in the search incident to Defendant's firearm arrest.

**IV. Conclusion**

For the reasons indicated herein, the Court does not find well-taken Defendant's arguments in support of his motion. The actions of Officers Stewart and Grubbs were reasonable, justified, and in accordance with constitutional principles. Accordingly, the Court DENIES Defendant's Motion to Suppress (doc. 13).


SO ORDERED.

DATE: May 1, 2007   /s/ S. Arthur Spiegel
                    S. Arthur Spiegel
                    United States Senior District Judge